UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X
DNJ LOGISTIC GROUP, INC.,

       Plaintiff,             <u>MEMORANDUM AND ORDER</u>

   -against-              Civil Action No.
                           08-CV-2789(DGT)

DHL EXPRESS (USA), INC. and
ANTHONY N. CATAPANO,

       Defendants.

-------------------------------X

Trager, J:

    Plaintiff DNJ Logistic Group, Inc. ("DNJ") brings this action against DHL Express (USA), Inc. ("DHL") and Anthony N. Catapano, DHL's Director of Business Development, for claims surrounding a failed contract between the two shipping companies. In summer 2007, DHL and DNJ entered into an agreement under which DNJ – previously a major subcontractor for FedEx – agreed to operate an express shipment service from New York to Europe for DHL. DNJ claims that it was induced to enter the contract, to incur related expenses and to cancel its contract with FedEx by Catapano's promises of shipment volumes and start dates with DHL that never ultimately materialized. As a result, plaintiff believes that not only did DHL breach its contract with DNJ, but also that DHL's actions, and the actions of Catapano, amounted to violations of the Racketeer Influenced

and Corrupt Organizations Act ("RICO") and common law fraud and negligent misrepresentation.  Federal jurisdiction is premised on the federal question presented by plaintiff's RICO allegations.  <u>See</u> 18 U.S.C. § 1331.

Defendants have moved under Fed. Rule Civ. P. 12(b)(6) to dismiss all of plaintiff's claims except for its breach of contract claim; plaintiff has cross-moved for leave to file a third amended complaint.  For the reasons explained below, defendant's motion to dismiss is granted with respect to plaintiff's RICO claims and plaintiff's cross-motion to amend is denied with respect to its RICO claims.  Decision on plaintiff's remaining state law claims is reserved, pending resolution of lingering jurisdictional questions.

**Background**

**(1)**

**Contract Negotiations between DNJ and DHL**

The following facts are drawn from plaintiff's proposed third amended complaint and, for purposes of this motion, are presumed to be true.[1]  Plaintiff DNJ is a subcontractor for major

---

[1] Although defendant opposes plaintiff's cross-motion for leave to amend, plaintiff's third amended complaint must be assessed on its merits in order to determine whether or not the filing of an amended complaint would be "futile" and should thus be denied.  <u>See, e.g.</u>, <u>Mackensworth v. S.S. Am. Merch.</u>, 28 F.3d 246, 251 (2d Cir. 1994) (leave to amend, although freely

domestic and international delivery and logistics companies.
Compl. ¶ 11.  In November 2006, plaintiff began negotiations
with defendant DHL – a major delivery and shipping company based
in Florida and doing business internationally – for a
subcontract under which plaintiff would handle part of a new DHL
program making overnight express deliveries to Europe.  Id. at
¶ 10-17, 30.  DNJ representatives negotiated the contract
primarily with Anthony Catapano, DHL's Director of Business
Development.  Id. at ¶ 9, 12-21.  These negotiations culminated
in a contract signed June 19, 2007, the details of which are not
set forth in the complaint.  Id. at ¶ 21.

   Prior to beginning negotiations with DHL, DNJ operated
primarily as a subcontractor for FedEx, earning approximately
$40,000,000 from FedEx between the years 2002 and 2007.  Id. at
¶ 34.  However, DNJ's complaint alleges that it was compelled to
give up this account by Catapano and DHL, through false promises
of receiving four to five times more revenue with DHL than with
FedEx.  Id. at ¶ 35.

   Specifically, plaintiff recites a series of verbal
statements and emails from Catapano to DNJ that contained
promises of certain shipment volumes and start dates that failed
to materialize.  A few verbal statements date from before the

_____

granted, should not be given if amendment would be futile).  For
this reason, whenever the complaint is cited, such citation
refers to plaintiff's proposed third amended complaint.

contract was signed on June 19, 2007. On May 31, Catapano said to plaintiff's representatives that plaintiff would be handling "a large volume; much larger than the volume of FedEx." Id. at ¶ 27. A few days later, on June 4, Catapano told plaintiff's representatives that "the start date will happen very soon." Id. at ¶ 28.

The complaint includes additional verbal promises made after the contract had been signed. On June 26, 2007, Catapano told DNJ employees that the new DHL international program would "blow FedEx out of the water," and that "all FedEx's international priority customers [would] eventually come over to DHL." Id. at ¶ 29. In an August 3, 2007 meeting with DNJ employees, Catapano is reported to have said, "in sum and substance," that "DNJ will be DHL's exclusive agent to handle the entire New York overnight express to Europe." Id. at ¶ 30. Plaintiff also points to a statement from Catapano to DNJ representatives on September 4, 2007, promising that operations would start the next day. Id. at ¶ 31.

The complaint further mentions a series of email promises. A July 27, 2007 email from Catapano to a DNJ employee included the statement, "I believe the 1500 per night will begin Monday. . ." Id. at ¶ 24e. On July 31, 2007, Catapano emailed plaintiff to explain that shipments would start August 7, 2007, and then stated: "This is for the 1500 pounds per day." Id. at

¶ 24f.  Later, in an August 22, 2007 email, Catapano wrote to a DNJ employee: "Please advise Ralph we have a start date for CMS of Sept. 6. . . .  300 per day!!!"  Id. at ¶ 24h.  On that same day, Catapano sent plaintiff a copy of an internal DHL email confirming that "[t]he start date has been finalized for September 6, 2007.  They will be giving us about 100 to 300 lbs per day."  Id. at ¶ 24i.  Then, in a September 13, 2007 email, Catapano explained: "We are moving forward so the volume will start to move up real quick."  Id. at ¶ 24m.

    Plaintiff explains that it was on the basis of these representations that it ended its relationship with FedEx.  Although the complaint is not specific about the termination date of this relationship, it states that it occurred "at or about the same time DHL delivered the Agreement and made the written and oral promises . . . ."  Id. at ¶ 38.  The complaint further points out that defendants now service many of plaintiff's former FedEx clients, having obtained their contact information from plaintiff.  Id. at ¶ 37, 44.  Also on the basis of Catapano's representations and reportedly at the insistence of DHL that its vendor be based in Florida, plaintiff's principal established a residence and set up a shipping location in Florida.  Id. at ¶ 39.

    Performance under the contract apparently began sometime in summer 2007.  In August 2007, plaintiff contacted Catapano to

express dissatisfaction with the volumes of shipments that had been achieved, and Catapano responded that he believed the volumes would substantially increase shortly. Id. at ¶ 40. Unfortunately, the volume of shipments anticipated under the contract between DNJ and DHL never materialized. Id. at ¶ 41. At some point, it seems the relationship between DNJ and DHL terminated, although the circumstances are not made clear.

**(2)**

**Incorrect Vendor Number and Personal Loan**

DNJ's complaint also describes concerns with the way in which it received payment from DHL for its services. When DNJ entered into the contract with DHL, it was assigned a "vendor #." Id. at ¶ 42. However, in November 2007, DNJ discovered the number it had been assigned was duplicative of another DHL vendor's "vendor #." Id. DNJ believes, contrary to assertions by Catapano, that it never was properly entered into DHL's vendor database. Id. at ¶ 43. Instead, it believes that the checks it received for its services, which bore the improper vendor number "ZONETIME," id. at ¶ 47, came from an account controlled by Catapano. Id. at ¶ 48. Plaintiff explains that despite being assured by Catapano that DNJ was in DHL's system and that checks were coming from DHL's processing center in Costa Rica, id. at ¶ 24p, in December 2007 DHL headquarters

advised plaintiff that DNJ was not in the DHL system and that
DNJ needed to fill out proper paperwork to be entered.  Id. at
¶ 49-51.  Nevertheless, despite this confusion, it appears that
payments were made from DHL to DNJ for goods shipped under the
contract in January 2008, at DNJ's request.  Id. at ¶ 53.

One final set of facts in plaintiff's complaint describes a
June 2007 deal between Catapano and DNJ's principal, in which
Catapano insisted plaintiff's principal lend him $50,000.  Id.
at ¶ 19.  The loan was to be repaid through Catapano's enhanced
commissions that he would receive from DHL's new priority
program.  Id.  In January 2008, after the DHL/DNJ contract
failed to perform as expected, DNJ demanded repayment from
Catapano of the $50,000 loan.  Id. at ¶ 54.  At the end of March
2008, Catapano repaid $34,000 of the loan.  Id. at ¶ 56.  For
several months after this, Catapano supplied plaintiff with
various reasons why he could not afford to complete repayment of
the loan.  See id. at ¶ 54-60.  Then, in May 2008, DNJ told
Catapano that DHL would be informed of the loan and of the fact
that Catapano had improperly borrowed DNJ's company car;
Catapano responded that he "need[ed] to have that not happen."
Id. at ¶ 62.  Shortly thereafter, on May 27, 2008, Catapano
repaid the remainder of the loan.  Id.

### The Current Action

Plaintiff first brought this action in New York Supreme Court on or about June 10, 2008. Defendants responded by removing the case to federal court in July 2008, on the ground that diversity jurisdiction would exist but for plaintiff's fraudulent joinder of Catapano as a defendant. See Docket for 08-cv-2789, Doc. No. 4. Although plaintiff originally filed a motion to remand, it later withdrew this motion and instead filed a second amended complaint on September 26, 2008, containing federal law RICO claims that made federal jurisdiction proper. This second amended complaint set forth claims of (1) racketeering and conspiracy, under RICO; (2) fraud and deceit; (3) breach of contract; (4) specific performance; (5) fraudulent inducement; (6) respondeat superior; (7) negligent supervision; (8) negligent hiring and retention of employee; (9) punitive damages; (10) interference with business relationship/economic advantage; (11) negligent misrepresentation and (12) individual liability for breach of contract on the part of Catapano. Id. at Doc. No. 12, p.7-15. Plaintiff has since filed a cross-motion for leave to file a third amended complaint, after receiving defendants' motion to dismiss. This third amended complaint removes three of plaintiff's twelve claims – (4) specific performance; (10)

interference with business relationship/economic advantage; and
(12) Catapano's independent liability for breach – and
reinforces the remaining claims with additional facts.  <u>See</u> Aff.
Of Robert J. Spence in Supp. Of Cross-Mot. to Amend Compl. ¶ 4.

Defendants oppose plaintiff's cross-motion for leave to
amend, arguing that it would cause unnecessary delay and
expense.  Defendants further argue that amendment would be
futile because, even as amended, the majority of plaintiff's
claims cannot survive a motion to dismiss.  Specifically,
defendant moves under Fed. Rule Civ. Procedure 12(b)(6) to
dismiss plaintiff's claims of (1) RICO violations, (2) fraud,
(3) fraudulent inducement, (4) tortious interference and
(5) negligent misrepresentation against both defendants;
(6) respondeat superior and (7) negligent hiring, retention and
supervision against DHL; and (8) breach of contract against
Catapano.[2]

### Discussion

### (1)

### Standards Governing Motions to Dismiss

When evaluating a motion to dismiss for failure to state a
claim under Rule 12(b)(6), a court shall "accept as true all of

---

[2] The sole claim that defendants' present motion does not seek to
have dismissed is plaintiff's breach of contract claim against
DHL.

the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." <u>Roth v. Jennings</u>, 489 F.3d 499, 510 (2d Cir. 2007). To survive a motion to dismiss, a complaint must state a claim to relief that is "plausible on its face." <u>Bell Atl. v. Twombly</u>, 127 S.Ct. 1955, 1974 (2007). This standard, although not stringent, requires a plaintiff to "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim <u>plausible</u>." <u>Boykin v. KeyCorp</u>, 521 F.3d 202, 213 (2d Cir. 2008). In other words, "[l]egal conclusions and 'threadbare recitals of the elements of a cause of action' do not suffice to state a claim . . . ." <u>Ebusinessware, Inc. v. Tech. Servs. Group Wealth Mgmt. Solutions, LLC</u>, 08-Civ-09101, 2009 WL 5179535, at *5 (S.D.N.Y. Dec. 29, 2009) (quoting <u>Ashcroft v. Iqbal</u>, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009)).

Additionally, the Federal Rules of Civil Procedure set forth special pleading requirements for claims of fraud. In alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This rule requires a plaintiff to "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3)

state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004).

## (2)

## RICO

Defendants first attack plaintiff's complaint on the ground that it fails to state a cause of action under RICO.  For its part, plaintiff believes it has properly alleged both a substantive RICO violation, under 18 U.S.C. § 1962(c), and conspiracy to commit this violation, under 18 U.S.C. § 1962(d).

To establish a RICO claim under § 1962(c), a plaintiff must show: (1) a violation of § 1962(c); (2) an injury to business or property; and (3) that the injury was caused by the violation of § 1962(c).  DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001). Section 1962(c) makes it unlawful:

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

To successfully allege a violation of § 1962(c), a plaintiff must therefore show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Id. at 306

(quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)). Defendants believe that almost all of these required elements are lacking here. Although it appears clear that Catapano was "conducting" some activity on behalf of DHL, per the first prong of the above-stated test, defendants argue that plaintiff has not adequately established the existence of an enterprise, racketeering activity or a pattern of racketeering activity.

### a. The Existence of an Enterprise

Taking up defendant's first argument, defendants believe that because Catapano works for DHL, there is no distinct enterprise alleged. The term "enterprise" is defined in 18 U.S.C. § 1961 as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4). Defendants correctly point out that under Second Circuit precedent, a "corporate defendant associated with its own employees" does not constitute a RICO enterprise. Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 89 (2d. Cir. 1999). However, a subsequent Supreme Court decision refined this statement to make clear that the statutory language simply requires alleging that a "person" – i.e., some legal entity other than the enterprise itself – unlawfully conducted the

affairs of the "enterprise," which includes by definition a

corporation.  See Cedric Kushner Promotions, Ltd. v. King, 533

U.S. 158, 163 (2001).  Thus, an allegation that "a corporate

employee, acting within the scope of his authority . . .

conduct[ed] the corporations affairs in a RICO-forbidden way,"

is sufficient to plead the existence of an enterprise.  See id.

(explaining that a corporate employee "is distinct from the

corporation itself, a legally different entity with different

rights and responsibilities . . . . [And] nothing in the statute

. . . requires more 'separateness' than that.").

    Here, plaintiff has alleged RICO violations against both

DHL and Catapano.  With respect to Catapano, the pleadings

allege that Catapano, as an employee acting within the scope of

his duties, unlawfully conducted the affairs of DHL.  In this

situation, Catapano serves as the "person" and DHL serves as the

"enterprise" required to set forth a RICO claim.  See id. at

163-64.  Therefore, plaintiff's RICO claims against Catapano

adequately plead an enterprise and should not be dismissed on

this ground.

    As for plaintiff's claims against DHL, however, defendants

are correct that as a named defendant, DHL fills the roles of

both the alleged person and enterprise.  In this context, DHL is

nothing more than a "corporate defendant associated with its own

employees."  Anatian, 193 F.3d at 89.  As such, the RICO claims

against DHL fail to allege a separate person and enterprise and must be dismissed for this reason.  See Moses v. Martin, 360 F. Supp. 2d 533, 549-52 (S.D.N.Y. 2004) (determining that a corporation cannot be both the alleged enterprise and the RICO defendant, and collecting cases to this effect);[3] cf. Panix Promotions, Ltd. v. Lennox Lewis, 01-Civ-2709, 2002 U.S. Dist. LEXIS 784, at *18-20 (S.D.N.Y. Jan. 17, 2002) (dismissing RICO claim against the subsidiary of an enterprise and finding that it did not constitute a separate "person" from the enterprise, while maintaining RICO claims against a particular employee of the enterprise).

### b. Racketeering Activity

Although plaintiff's RICO claims against Catapano sufficiently plead an enterprise, plaintiff has failed to demonstrate that Catapano engaged in "racketeering activity." See 18 U.S.C. § 1962(c).  Plaintiff alleges that Catapano committed mail and wire fraud, Compl. ¶ 65, both of which are included in RICO's definition of "racketeering activity."  See

---

[3] However, Moses also acknowledged that some courts – though a minority – have permitted a corporation to be liable for its employee's RICO violations on a theory of respondeat superior. Id. at 550-51.  For present purposes, however, it is unnecessary to delve into whether DHL could be held vicariously liable for Catapano's RICO violations, as, for reasons explained infra, plaintiff has not adequately alleged that Catapano committed any RICO violations.

18 U.S.C. § 1961(1) (defining racketeering activity as including "any act which is indictable under" 18 U.S.C. § 1341 (relating to mail fraud) or § 1343 (relating to wire fraud)). To prove either mail or wire fraud, a plaintiff must demonstrate: "(1) the existence of a scheme to defraud, (2) the defendant's knowing participation in the scheme, and (3) the use of wire, mail, or television communications in interstate commerce in furtherance of the scheme." Chanayil v. Gulati, 169 F.3d 168, 170-71 (2d Cir. 1999); see also Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004).

A bare allegation of mail or wire fraud in a complaint is insufficient to demonstrate racketeering activity. Rather, the more specific pleading requirements of "Rule 9(b) appl[y] to RICO when fraud is the predicate illegal act." Ebusinessware, Inc., 2009 WL 5179535, at *17 (citing Moore v. PaineWebber, Inc., 189 F.3d 165, 172 (2d Cir. 1999)). In order to satisfy Rule 9(b), "allegations of predicate mail and wire fraud acts should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176-77 (2d Cir. 1993). Additionally, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." PaineWebber, 189 F.3d at 173 (internal quotation marks omitted).

Although plaintiff makes some detailed allegations in support of its wire fraud claim, plaintiff's mail fraud claim is clearly insufficient. Plaintiff's sole allegation of mail fraud is that "the mails . . . were used in connection with and in furtherance of other aspects of the aforesaid enterprise, scheme and conspiracy to defraud Plaintiff." Compl. ¶ 65. Nowhere does plaintiff's complaint detail any facts suggesting how or when the mail was used, the contents of communications sent through the mail or why such communications were fraudulent. This vague allegation of mail fraud fails to form the basis of a plausible RICO claim. Cf. Anatian, 193 F.3d at 88 (affirming dismissal of a RICO claim for failure to plead the alleged RICO predicate acts of mail and wire fraud with particularity).

Turning to the claim of wire fraud, plaintiff has detailed several statements it believes illustrate wire fraud with particularity:[4]

---

[4] Although the interstate component required to show wire fraud might seem to be lacking in this case, as both Catapano and DNJ are located in New York, recent cases appear to treat any use of the internet as sufficiently interstate in nature. See United States v. Fumo, Crim. A. No. 06-319, 2009 WL 1688482, at *8 (E.D. Pa. June 17, 2009) ("As both the means to engage in commerce and the method by which transactions occur, the Internet is an instrumentality and channel of interstate commerce.") (internal quotation marks omitted); United States v. Pomerico, Crim. A. No. 06-113, 2008 WL 4469465, at *3 (E.D.N.Y. Oct.30, 2008) (finding that "use of the Internet satisfies the interstate commerce element" in the context of the child pornography statute).

1) May 31, 2007, Catapano to plaintiff's representatives: Plaintiff would be handling "a large volume; much larger than the volume of FedEx." Compl. ¶ 27.

2) June 26, 2007, Catapano to DNJ employees: The new DHL international program would "blow FedEx out of the water," and "all FedEx's international priority customers [would] eventually come over to DHL." Id. at ¶ 29.

3) July 27, 2007 email from Catapano to a DNJ employee: "I believe the 1500 per night will begin Monday. . ." Id. at ¶ 24e.

4) July 31, 2007 email from Catapano to DNJ, stating that shipments would start August 7, 2007, and then: "This is for the 1500 pounds per day." Id. at ¶ 24f.

5) August 3, 2007, statement "in sum and substance" by Catapano to DNJ employees: "DNJ will be DHL's exclusive agent to handle the entire New York overnight express to Europe." Id. at ¶ 30.

6) August 22, 2007, Catapano to DNJ employee, "Please advise Ralph we have a start date for CMS of Sept. 6. . . . 300 per day!!!" Id. at ¶ 24h.

7) August 22, 2007, Catapano to DNJ employee: "The start date has been finalized for September 6, 2007. They will be giving us about 100 to 300 lbs per day." Id. at ¶ 24i.

8) September 4, 2007, Catapano to DNJ employees: "The start date of operations is September 5, 2007." Id. at ¶ 31.

9) September 13, 2007 email from Catapano to DNJ employee: "We are moving forward so the volume will start to move up real quick." Id. at ¶ 24m.[5]

---

[5] This list includes some statements that were not made "over the wires," but rather were made in person to DNJ employees. However, if, on the whole, these statements were found to constitute a "scheme to defraud" orchestrated with fraudulent intent, the fact that some of the statements were not made via email would not prove fatal for plaintiff's claims. See U.S. v. Reifler, 446 F.3d 65, 95-96 (2d Cir. 2006) ("To be in furtherance of the fraud, the wire transmission need not be an essential element of the scheme; rather, it is sufficient if

However, plaintiff's wire fraud allegations suffer a critical defect: they do not sufficiently allege fraudulent intent. See Polar Molecular Corp., 12 F.3d at 1176-77. "[T]o establish scienter for the fraud claim [at the pleading stage], the plaintiffs must either (1) identify circumstances indicating conscious or reckless behavior by the defendants, or (2) allege facts showing a motive for committing fraud and a clear opportunity for doing so." San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 813 (2d Cir. 1996). Plaintiff here has shown neither.

First, plaintiff has not identified circumstances that indicate conscious or reckless behavior by Catapano. After setting forth the above-listed detailed statements made by Catapano, the complaint states generally that the promised start dates and shipment volumes did not occur, but fails to allege any facts suggesting that the above-pled statements were made with fraudulent intent, rather than being mere promises or expectations that did not materialize. Plaintiff conclusorily alleges fraudulent intent at several points in the complaint: e.g., "Defendants knew . . . that the shipment volumes promised . . . were not realistic . . . ." Id. at ¶ 72; see also id. at

---

that transmission was incident to an essential part of the scheme, . . . or a step in the plot.") (internal marks and emphasis omitted).

¶ 46 ("On information and belief, the statements made concerning

. . . exclusivity [and] volumes of shipments . . . were

knowingly false when made by Catapano, DHL and its agents and

representatives[.]"), ¶ 83 (same).[6]  Such conclusory allegations,

however, are insufficient to survive the pleading stage of a

fraud claim under Rule 9(b).  See Shields v. Citytrust Bancorp,

Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) (dismissing fraud claim

because plaintiff's pleading technique was simply to "couple a

factual statement with a conclusory allegation of fraudulent

intent," and these "conclusory allegations – that Defendants

'knew but concealed' some things, or 'knew or were reckless in

not knowing' other things – do not satisfy the requirements of

Rule 9(b)").

Moreover, plaintiff cannot proceed under the alternative

route of proving fraudulent intent by showing motive and

opportunity, because plaintiff has not adequately pled any

motive for the alleged fraud.  See San Leandro, 75 F.3d at 813.

The fatal fact for plaintiff in this regard is that all but one

of the statements detailed above date from after DNJ and DHL

entered into a contract.  Thus, it is difficult to understand

---

[6] With respect to exclusivity, plaintiff has not alleged any fact
– such as the existence of another New York carrier actually
being given overnight express to Europe business by DHL – to
suggest that the promise that DNJ would be DHL's exclusive agent
to handle the overnight express to Europe was false, much less
made with fraudulent intent.

exactly what plaintiff is alleging as the "scheme to defraud,"
given that defendant already had the contract it sought with
plaintiff when the vast majority of the allegedly fraudulent
statements were made.  Plaintiff vaguely suggests that the
statements by Catapano may have further caused it to establish a
presence in Florida, Compl. ¶ 39, cancel its contract with
FedEx, id. at ¶ 38, and give its client contact information to
DHL, id. at ¶ 44.  However, it is unclear exactly when plaintiff
did any of these things; the complaint states only that
plaintiff cancelled its contract with FedEx "at or about the
same time DHL delivered the Agreement and made the written and
oral promises which served to modify the Agreement," and fails
entirely to specify the date plaintiff set up a location in
Florida or was induced to give its client contacts to DHL.  Id.
at ¶ 38-39, 44.  On the basis of the facts alleged, it is not
clear that Catapano, after the contract was made, had any real
reason to lie to plaintiff about his projections of how the
contract would proceed.[7]

---

[7] It might be argued that Catapano's motivation was to harm DHL's
competitor FedEx by inducing DNJ to cancel its FedEx contract.
However, plaintiff never alleges that Catapano actually told DNJ
representatives that DNJ had to give up, or even should give up,
its contract with FedEx; rather, it appears that plaintiff chose
to do so voluntarily based on Catapano's optimistic projections.
This lack of direct causation further undermines plaintiff's
RICO claims.

Indeed, it seems that Catapano and DHL would have benefited greatly from having DNJ's shipment volumes as high as Catapano predicted, and the start dates as soon as he promised, given that both DNJ and DHL profited from additional shipment volume. Essentially, the only fact plaintiff has adduced to demonstrate Catapano's fraudulent intent in making these statements is that these volumes and start dates ultimately did not materialize. As such, plaintiff has done nothing more than "record[] statements by defendants predicting a prosperous future and hold[] them up against the backdrop of what actually transpired." Shields, 25 F.3d at 1129. This pleading technique "is sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud." Id.; see also Harrell v. Primedia, Inc., 02-cv-2893, 2003 WL 21804840, at *3 (S.D.N.Y. Aug. 6, 2003) (dismissing a fraud-based RICO claim when there were no facts alleged to show that defendants were not speaking truthfully when they made promises to plaintiffs regarding future stock options).

Therefore, because plaintiff has pointed to no facts to support its claim that Catapano was acting with fraudulent intent in his emails and statements to plaintiff, plaintiff has failed to state a plausible claim of wire fraud – the predicate act of its RICO claim – and therefore its claim under § 1962(c)

against Catapano must be dismissed.  Accordingly, plaintiff's
§ 1962(d) claim, alleging a RICO conspiracy, also fails.  See
Knoll v. Schectman, 06-cv-1832, 275 Fed. App'x 50, 2008 WL
1868440, at *1 (2d Cir. April 25, 2008) ("[A]ny claim under
section 1962(d) based on a conspiracy to violate other
subsections of section 1962 necessarily must fail if the
substantive claims are themselves deficient.") (quoting Discon,
Inc. v. NYNEX Corp., 93 F.3d 1055 (2d Cir. 1996), vacated on
other grounds, 525 U.S. 128 (1998)).

     Plaintiff's complaint might also be construed, when read
liberally, to allege a RICO wire or mail fraud claim based on
the loan it gave to Catapano and the false vendor number
Catapano allegedly provided to DHL.  However, these claims fail
not only for lack of particularity under Rule 9(b), but also
because plaintiff has failed to plead any injury from these
occurrences, as is required to maintain a RICO claim.  See
DeFalco, 244 F.3d at 305 (second element of RICO cause of action
is injury to business or property).  DNJ appears to have
received payment from DHL for its services upon request in spite
of the faulty vendor number, see Compl. ¶ 53, and Catapano has
repaid the loan to plaintiff in full, id. at ¶ 63.  Therefore,
any statements regarding the vendor number or the loan do not
give rise to a RICO cause of action.

## c. Pattern of Racketeering Activity

In case plaintiff believes that a further amended complaint might cure the defects in its RICO pleadings, it is worth proceeding to discuss plaintiff's further inability to establish the "pattern of racketeering activity" required to set forth a RICO claim. RICO requires not only proof that defendant engaged in racketeering activity, but that he or she engaged in a "pattern of racketeering activity." § 1962(c). "RICO's pattern element . . . serves to ensure that a defendant's criminal participation in an enterprise is not merely isolated or sporadic, but indicative of the sort of continuity of criminal activity – or the threat of continuity – that is the hallmark of racketeering." United States v. Pizzonia, 577 F.3d 455, 465 (2d Cir. 2009). In order to establish a pattern, at least two acts of racketeering must be committed by a defendant, and these acts must manifest continuity in one of two forms: either closed-end continuity, which is a closed period of repeated conduct, or open-ended continuity, which is "past conduct that by its nature projects into the future with a threat of repetition." Id.

Plaintiff here has not pled facts giving rise to a possibility of either closed- or open-ended continuity. "To satisfy closed-ended continuity, the plaintiff must prove a series of related predicates extending over a substantial period of time." Spool v. World Child Int'l Adoption Agency, 520 F.3d

178, 184 (2d Cir. 2008) (internal quotation marks omitted). The
concept of closed-ended continuity is thus primarily a temporal
one, and the Second Circuit has never held that a period of time
of less than two years constitutes the "substantial period"
necessary to illustrate closed-ended continuity. Id. To the
contrary, the Second Circuit found in Spool that a series of
RICO predicates occurring over sixteen months demonstrated no
closed-ended continuity, particularly given "the absence of
separate schemes or large numbers of participants and victims"
involved in the scheme under consideration there. Id.

In the instant case, even reading plaintiff's complaint
generously, the alleged underlying predicate acts occurred only
between November 2006 and October 2007. See Compl. ¶ 12
(negotiations with Catapano began Nov. 2, 2006); id. at ¶ 24p
(last email from Catapano dated Oct. 31, 2007). This period of
less than one year, particularly when coupled with the fact that
plaintiff alleges only one scheme and one victim, certainly does
not illustrate closed-ended continuity. See Cofacredit, S.A. v.
Windsor Plumbing Supply Co., 187 F.3d 229, 244 (2d Cir. 1999)
("[T]he predicate acts that the Windsor Defendants committed
spanned less than one year – a period of insufficient length to
demonstrate closed-ended continuity under our precedents."); see
also Spool, 520 F.3d at 184.

The scheme outlined in plaintiff's complaint also fails to demonstrate open-ended continuity. Open-ended continuity requires a showing of "a threat of continuing criminal activity beyond the period during which the predicate acts were performed." Cofacredit, 187 F.2d at 242. When the enterprise at issue is a legitimate one, as opposed to a criminal organization, open-ended continuity requires "some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." Id. at 243. Here, again reading generously, plaintiff has alleged that it was fraudulently induced to sacrifice its other business interests and to spend money on setting up a subcontracting business for DHL, in reliance on heavy volumes of shipments that never materialized. However, no facts are alleged to support an inference that defendants' acts – even if they rose to the level of wire fraud, which in this case they do not – are the way DHL typically does business, or that these predicate acts are ongoing. In fact, plaintiff makes no mention of an ongoing relationship with DHL, and the last interaction detailed in the complaint between DNJ and DHL is payment from DHL to DNJ for goods shipped in January 2008. Compl. ¶ 53. None of these facts suggest that open-ended continuity is present in this case. Cf. Spool, 520 F.3d at 186

(finding that a "serious, but discrete and relatively short-lived scheme to defraud a handful of victims" did not establish open-ended continuity).  Accordingly, plaintiff's RICO claims further fail because of their insufficiency to demonstrate a pattern of racketeering activity.


### (3)

### Remaining State Law Claims

After determining that plaintiff's RICO claims cannot withstand a motion to dismiss, it remains to be determined how to treat plaintiff's state law claims.  Prior to the instant motion, the parties had a protracted struggle over whether this case belonged in state or federal court.  Ultimately, they agreed that the matter could proceed in federal court, under 18 U.S.C. § 1331, after plaintiff amended its complaint to add RICO claims.  These RICO claims – the sole federal claims in this lawsuit – are now being dismissed pursuant to Rule 12(b)(6). Under these circumstances, this court would typically decline to retain jurisdiction over plaintiff's remaining state law claims and would remand to state court.  See generally 28 U.S.C. § 1367(c)(3); cf. Harrell, 2003 WL 21804840, at *3 (declining to exercise jurisdiction over plaintiffs' state law claims after dismissing plaintiffs' RICO claims).  However, there remains in this case a dispute over whether diversity of citizenship

provides an alternate basis for federal subject matter
jurisdiction.  To aid in the determination of this issue, the
parties are directed to submit briefs addressing whether or not
this action properly belongs in federal court under diversity
jurisdiction, pursuant to the briefing schedule set forth in the
conclusion of this memorandum and order.


## (4)

### Plaintiff's Cross-Motion to Amend Its Complaint

Finally, plaintiff's cross-motion to amend its complaint,
which defendant opposes, must be addressed.  In general, leave
to amend a complaint shall be freely given "when justice so
requires."  Fed. R. Civ. P. 15(a)(2).  Nevertheless, such
amendments are only permissible (1) when the party seeking the
amendment has not unduly delayed, (2) when that party is not
acting in bad faith or with a dilatory motive, (3) when the
opposing party will not be unduly prejudiced by the amendment
and (4) when the amendment is not futile.  Foman v. Davis, 371
U.S. 178, 182 (1962); see also Mackensworth, 28 F.3d at 251.
"An amendment is considered futile if the amended pleading fails
to state a claim or would be subject to a successful motion to
dismiss on some other basis."  Chan v. Reno, 916 F. Supp. 1289,
1302 (S.D.N.Y. 1996).  When, as here, a cross-motion for leave
to file an amended complaint is made in response to a motion to

dismiss under Rule 12(b)(6), the standard for measuring futility is whether or not the proposed new claims can withstand a 12(b)(6) motion, "i.e., if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001). If, on the other hand, plaintiff has "at least colorable grounds for relief, justice [requires] leave to amend." Kaster v. Modification Sys., Inc., 731 F.2d 1014, 1018 (2d Cir. 1984) (internal quotation marks omitted).

For the reasons explained above, this opinion only reaches the viability of plaintiff's RICO claims, not its state law claims. As it has been determined that plaintiff's proposed third amended complaint still fails to state a cause of action under RICO, leave to amend the complaint with respect to plaintiff's RICO claims is denied as futile. However, the question of whether to grant plaintiff's request to amend its complaint with respect to its state law claims is reserved for determination if this case remains in federal court.

## Conclusion

For the reasons stated above, defendant's motion to dismiss with respect to plaintiff's RICO claims is granted. Decision is reserved on plaintiff's cross-motion to amend its complaint, except that leave to amend with respect to plaintiff's RICO claims is denied as futile. The parties are directed to submit briefs on the issue of whether or not subject matter jurisdiction properly lies in federal court on the basis of diversity jurisdiction within thirty (30) days of the date of this order. The parties may submit any replies within thirty (30) days of initial submissions.

Dated: Brooklyn, New York
      February  18, 2010


                                SO ORDERED:


                                      /s/
                                David G. Trager
                                United States District Judge